**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **WATSON WOODS HEALTHCARE, INC., d/b/a GRANITE CREEK HEALTH AND REHABILITATION CENTER; LA JOLLA SKILLED, INC., d/b/a THE SPRINGS AT PACIFIC REGENT; BIG BLUE HEALTHCARE, INC., d/b/a RIVERBEND POST ACUTE REHABILITATION; LYNNWOOD HEALTH SERVICES, INC., d/b/a LYNNWOOD POST ACUTE REHABILITATION CENTER; LONE STAR MTC, INC.; HEALTHLIFT MEDICAL TRANSPORTATION, INC.; MAVSTAR MEDICAL TRANSPORTATION, INC.; MEDSTAR MEDICAL TRANSPORTATION, LLC; NEW ENGLAND MEDICAL TRANSPORTATION, INC.; BAKORP, LLC; PMDCA, LLC; PMDLAB, LLC; and PMDTC, LLC,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No.**<br><br>**JURY TRIAL DEMANDED** |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) ) | |
| **ZURICH AMERICAN INSURANCE COMPANY,** | ) ) ) ) | |
| **Defendant**. | ) ) ) ) | |

## COMPLAINT

Plaintiffs Watson Woods Healthcare, Inc., doing business as Granite Creek Health and Rehabilitation Center ("Granite Creek"); La Jolla Skilled, Inc., doing business as The Springs at Pacific Regent ("The Springs"); Big Blue Healthcare, Inc., doing business as Riverbend Post Acute Rehabilitation ("Riverbend"); Lynnwood Health Services, Inc., doing business as Lynnwood Post Acute Rehabilitation Center ("Lynnwood"); Lone Star MTC, Inc. doing business as Lone Star Medical Transportation Company ("Lone Star"); Healthlift Medical Transportation, Inc. doing business as Healthlift Medical Transportation Company ("Healthlift"); MavStar Medical Transportation, Inc. doing business as MavStar Medical Transportation Company and Maverick Medical Transportation Company ("MavStar"); Medstar Medical Transportation, LLC, doing business as Medstar Medical Transportation Company ("Medstar"); New England Medical Transportation, Inc. doing business as New England Medical Transportation Company ("New England Medical"); Bakorp, L.L.C. doing business as Pacific Mobile Diagnostics ("Pacific Mobile"); PMDCA, LLC, doing business as 100 Plaza Medical Laboratory and PMD X-Ray and Laboratory – Southern California ("PMDCA"); PMDLAB, LLC doing business as Comprehensive Medical Laboratories and PMD X-Ray and Laboratory – Northern California ("PMDLAB"); and PMDTC, LLC doing business as Town and Country Diagnostics and PMD X-Ray and Laboratory ("PMDTC") hereby complain of Defendant Zurich American Insurance Company ("Zurich"), and allege as follows:

## INTRODUCTION

1.      Plaintiffs provide a broad range of healthcare-related and ancillary services, operating in several states throughout the country.  Like many businesses, Plaintiffs have suffered substantial financial losses as a result of SARS-CoV-2, COVID-19, the resulting actions and orders of federal, state, and local civil authorities, and the need to mitigate loss and damage.

2.      When Plaintiffs turned to Zurich, their commercial property and business interruption insurer, they reasonably expected Zurich to afford coverage for their financial losses under a pair of all-risk EDGE Healthcare property insurance and business interruption policies

designed specifically for entities operating in and around the healthcare industry. After all, the policies issued by Zurich promised coverage for Plaintiffs' economic losses from all risks except those expressly excluded. And, although the insurance industry has had a standard-form "virus and bacteria" exclusion since 2006 and various forms of pandemic exclusions, Zurich sold its policies without including either form of exclusions.

3.      Instead of honoring its promises to Plaintiffs, Zurich has wrongfully failed and refused to provide the policy benefits that Plaintiffs are entitled to receive. Plaintiffs are informed and believe, and on that basis allege, that Zurich has taken, and is taking, a similar position with other insureds, having adopted a corporate-wide position that deprives Plaintiffs and its other insureds of hundreds of millions of dollars of promised insurance. Plaintiffs are informed and believe, and on that basis allege, that Zurich has done so, and is doing so, to protect its financial interests at the expense of its insureds' interests and with conscious disregard and disdain for the rights, interests, and reasonable expectations of its insureds, including Plaintiffs.

4.      Zurich's conduct constitutes a breach of the insurance policies and violates the implied covenant of good faith and fair dealing. By this lawsuit, Plaintiffs seek recovery for the damages Zurich has inflicted upon them by its wrongful conduct. Plaintiffs also seek declaratory relief confirming that Zurich must honor the terms of its policies.

## JURISDCTION & VENUE

5.      The Court has subject matter jurisdiction to hear this case under 28 U.S.C § 1332 based on complete diversity of citizenship between the parties and because the amount in controversy as between each Plaintiff and Zurich, exclusive of the costs and interest, exceeds $75,000.

6.      The Court has personal jurisdiction over Zurich because Zurich is resident in this District and, furthermore, is licensed to transact, and transacts, business in the State of Illinois and this District.

7.     Venue is proper in this District under 29 U.S.C. § 1391 because Defendant resides in this District and a substantial portion of the acts and conduct giving rise to the claims occurred within the District.

## **PARTIES**

8.     Plaintiff Watson Woods Healthcare, Inc., doing business as Granite Creek Health and Rehabilitation Center ("Granite Creek") is a Nevada corporation with its principal place of business in Prescott, Arizona.

9.     La Jolla Skilled, Inc., doing business as The Springs at Pacific Regent ("The Springs"), is a Nevada Corporation with its principal place of business in La Jolla, California.

10.     Plaintiff Big Blue Healthcare, Inc., doing business as Riverbend Post Acute Rehabilitation ("Riverbend"), is a Nevada corporation with its principal place of business in Kansas City, Kansas.

11.     Plaintiff Lynnwood Health Services, Inc., doing business as Lynnwood Post Acute Rehabilitation Center ("Lynnwood"), is a Nevada corporation with its principal place of business in Lynnwood, Washington.

12.     Plaintiffs Granite Creek, The Springs, Riverbend, and Lynnwood (collectively, the "Facilities") operate skilled nursing and rehabilitative facilities, delivering physical, occupational, and speech therapy and related rehabilitation services, as well as long-term care to their residents.

13.     Plaintiff Lone Star MTC, Inc., doing business as Lone Star Medical Transportation Company ("Lone Star") is a Nevada corporation with its principal place of business in Austin, Texas.

14.     Plaintiff Healthlift Medical Transportation, Inc., doing business as Healthlift Medical Transportation Company ("Healthlift") is a Nevada corporation with its principal place of business in Houston, Texas.

15.     Plaintiff MavStar Medical Transportation, Inc. doing business as MavStar Medical Transportation Company and Maverick Medical Transportation Company ("MavStar"), is a Nevada corporation with its principal place of business in Dallas, Texas.

16.     Plaintiff Medstar Medical Transportation, LLC, doing business as Medstar Medical Transportation Company ("Medstar"), operates in Arizona.  Medstar is a single-member LLC whose sole member is JARR Transportation Group, Inc.  JARR Transportation Group, Inc. is an Arizona citizen with its principal place of business in Tempe, Arizona.

17.     Plaintiff New England Medical Transportation, Inc., doing business as New England Medical Transportation Company ("New England Medical") is a Nevada corporation with its principal place of business in Springfield, Massachusetts.

18.     Plaintiffs Lone Star, Healthlift, MavStar, Medstar, and New England Medical are wholly-owned subsidiaries of Capstone Transportation Investments, Inc. and are referred to herein collectively as the "Capstone Entities."  The Capstone Entities provide non-emergency medical transportation services to and from the hospital, physician appointments, care facilities, and elsewhere for medically related services for ambulatory transports, wheelchair transports, stretcher transports, hospice transports, and long-distance transports.

19.     Plaintiff Bakorp, LLC doing business as Pacific Mobile Diagnostics ("Pacific Mobile") is an Arizona limited liability company.  Bakorp's members are Rick Baker, a citizen of Arizona, and PMD Investments, LLC.  The Ensign Group, Inc., is the sole member of PMD Investments, LLC.  The Ensign Group, Inc., is a citizen of Delaware with its principal place of business in Mission Viejo, California.  Pacific Mobile operates a network of mobile laboratory and x-ray services for skilled nursing and acute care facilities in Arizona, Colorado, and Utah.

20.     Plaintiff PMDCA, LLC, doing business as 100 Plaza Medical Laboratory and PMD X-Ray and Laboratory – Southern California ("PMDCA"), is a Nevada limited liability company.  PMDCA's sole member is Bakorp, LLC.  Bakorp's members are Rick Baker, a citizen of Arizona, and PMD Investments, LLC.  The Ensign Group, Inc., is the sole member of PMD Investments, LLC.  The Ensign Group, Inc., is a citizen of Delaware with its principal

place of business in Mission Viejo, California. PMDCA provides clinical laboratory services to skilled nursing and acute care facilities in Southern California.

21.     Plaintiff PMDLAB, LLC, doing business as Comprehensive Medical Laboratories and PMD X-Ray and Laboratory – Northern California ("PMDLAB"), is a Nevada limited liability company.  PMDCA's sole member is Bakorp, LLC. Bakorp's members are Rick Baker, a citizen of Arizona, and PMD Investments, LLC.  The Ensign Group, Inc., is the sole member of PMD Investments, LLC.  The Ensign Group, Inc., is a citizen of Delaware with its principal place of business in Mission Viejo, California.  PMDLAB provides clinical laboratory services to skilled nursing and acute care facilities located in Northern California.

22.     Plaintiff PMDTC, LLC, doing business as Town and Country Diagnostics and PMD X-Ray and Laboratory ("PMDTC"), is a Nevada limited liability company.  PMDCA's sole member is Bakorp, LLC. Bakorp's members are Rick Baker, a citizen of Arizona, and PMD Investments, LLC.  The Ensign Group, Inc., is the sole member of PMD Investments, LLC.  The Ensign Group, Inc., is a citizen of Delaware with its principal place of business in Mission Viejo, California. PMDTC provides mobile x-ray services to skilled nursing and acute care facilities in California.

23.     Plaintiffs Pacific Mobile, PMDCA, PMDLAB, and PMDTC are collectively referred to herein as the "PMD Entities."

24.     Zurich is a corporation organized and existing under the laws of the State of New York with its headquarters in Schaumburg, Illinois.  Zurich is a part of the Zurich Insurance Group of Companies.  Plaintiffs are informed and believe, and on that basis allege that Zurich is owned by Zurich Holding Company of America and that its ultimate parent is Zurich Insurance Group Ltd.

25.     Zurich and the other members of the Zurich Insurance Group Ltd. brand hold themselves out to the public as the Zurich Insurance Group.  They maintain a worldwide website at https://www.zurich.com.  The Zurich Insurance Group makes various statements and representations on its website on behalf of its member companies, including Zurich.

26.     According to the Zurich Insurance Group website, the Zurich Insurance Group "is a leading multi-line insurer that serves its customers in global and local markets. With about 55,000 employees, it provides a wide range of property and casualty, and life insurance products and services in more than 215 countries and territories."[1]

27.     On its website, the Zurich Insurance Group proclaims:

> Our heritage is about helping customers understand and protect themselves from risk. Since 1872 we have been applying our expertise and experience so that *our customers can have the very best protection for the things they value*. This is our mission and the timeless idea behind our brand. It is also the authentic truth that has been and always will be at the heart of the Zurich brand.[2]

28.     Since the outbreak of the COVID-19 pandemic, the Zurich Insurance Group has made wide-ranging representations.  The following are some of the many representations and promises that the Zurich Insurance Group has made, and still makes as of the date of the filing of this lawsuit:

- "As a society, we are facing unprecedented challenges that are immediate and will have long-lasting implications. At Zurich, responding to these challenges goes to the heart of our purpose as a business, and our promise to customers."[3]

- "The spread of Coronavirus (Covid-19) is unprecedented and we understand this is an incredibly difficult time for families and businesses. We are here to help customers and businesses who are affected by the impact of Covid-19 in these challenging times."[4]

- "Customers buy insurance for times like these. They want to know that there is a

---

[1] https://www.zurich.com/en/about-us/a-global-insurer.
[2] https://www.zurich.com/en/about-us/a-global-insurer/our-brand. (emphasis added).
[3] https://www.zurich.com/services/coronavirus-support.
[4] https://www.zurich.com/-/media/project/zurich/dotcom/services/docs/coronavirus-support/homeworking-during-covid-19.pdf.

strong financial institution backing them up when they are in need."[5]

- "Our customers need us now more than ever. It's a challenging time for everyone, everywhere, both personally and professionally. How we in the insurance sector react in a crisis can make all the difference for the people we work with, especially the customers who trust and depend on us."[6]

- "David Henderson, chief human resources officer at Zurich, says that employers' duty of care is vital to the success of the social contract and that companies who protect their workforce – physically, mentally, financially – will be applauded in the post-Covid-19 era. He calls this a 'moment of truth' for all businesses."[7]

Unfortunately for Plaintiffs, Zurich has breached the time-honored principle that one's "word is its bond." In its "moment of truth," Zurich has failed miserably.

## THE POLICIES

29.     For the policy period of December 1, 2019, to December 1, 2020, Zurich issued Zurich EDGE Healthcare Policy number ZMD7426353-01 to Cornet Limited, Inc. (the "Cornet Policy"). Plaintiffs Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar are insureds under the Cornet Policy, which total policy limits of $450,000,000 per Occurrence, with sublimits for various perils. A true and correct copy of at least the relevant portions of the Cornet Policy is attached hereto as **Exhibit A** and incorporated herein by reference.

30.     For the policy period of December 1, 2019, to December 1, 2020, Zurich issued Zurich EDGE Healthcare Policy number ZMD7426352-01 to Ensign Services, Inc. (the "Ensign Policy"). Plaintiffs The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA are insureds under the Ensign Policy, which total policy limits of $250,000,000 per Occurrence, with

---

[5] Jack Howell, CEO, Zurich Asia Pacific, https://insuranceasianews.com/zurichs-jack-howell-on-ma-covid-19-and-wfh/.
[6] https://www.zurichna.com/knowledge/articles/2020/06/covid-19s-business-impact-6-ideas-for-insurance-brokers.
[7] https://www.zurich.com/en/knowledge/topics/workforce-protection/building-a-better-social-contract.

sublimits for various perils. A true and correct copy of at least the relevant portions of the Ensign Policy is attached hereto as **Exhibit B** and incorporated herein by reference.

31. The Cornet Policy and the Ensign Policy (together, the "Policies") are virtually identical in substance, containing the same policy basic coverage terms and conditions. The Policies were negotiated together, by the same individuals, and issued at the same time. The Policies provide broad "all-risk" coverage—that is, coverage against all risks of damage and loss except those conspicuously, plainly, clearly, and expressly excluded.

32. Zurich introduced its EDGE policies in 2008. When it did so, it stated:

> "We listened to our customers and developed a policy that meets their needs," said Mario Vitale, CEO of Zurich's Global Corporate in North America (GCiNA) business unit. "This new policy gives them higher limits, broader coverage and greater flexibility. The Zurich Edge dramatically enhances our ability to serve customers in this important line of business and offers significant advantages for global property programs and global property fronting arrangements.

> "In addition to being globally compliant, the policy also has the advantage of being offered by Zurich, which is often recognized for offering one of the broadest and most diverse portfolios of products and services in the world," Vitale said. "The Zurich Edge policy is clearly written with all limits, sub-limits and other critical coverage issues incorporated within the policy declarations and is supported by Zurich's global network of risk engineering and claims professionals."[8]

---

[8] http://www.zurichservices.com/zus/zna_config.nsf/pages/9123da88864cd81485257433006ed710!OpenDocument&Click=.

33.     The Policies insure against "direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property . . . ." Policies, ¶ 1.01. The phrase "direct physical loss of or damage . . . to . . . property" is not defined in the Policies. A **Covered Cause of Loss** is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded." *Id.* ¶ 7.11.

34.     The Policies have a separate section providing Plaintiffs with "Time Element" insurance. The Policies' "Loss Insured" provision states in relevant part:

> The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**, or as provided in Off Premises Storage for Property Under Construction Coverages.
>
> The Company will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability at other Insured Locations. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations. Such other Location must depend on the continuation of business activities at the **Location** that sustained direct physical loss or damage caused by a **Covered Cause of Loss**.

*Id.* ¶ 4.01.01.

35.     The Policies define "Suspension" as "[t]he slowdown or cessation of the Insured's business activities . . . ." *Id.* ¶ 7.58.

36.     The Policies' "Time Element" section also insures "Extra Expense," obligating Zurich to pay for

> the reasonable and necessary Extra Expenses incurred by the
> Insured, including the cost to remove and return patients, during
> the Period of Liability, to resume and continue as nearly as
> practicable the Insured's normal business activities that otherwise
> would be necessarily suspended, due to direct physical loss of or
> damage caused by a **Covered Cause of Loss** to Property of the
> type insurable under this policy at a **Location**.

*Id.* ¶ 4.02.03.

37.     The Policies also provide Plaintiffs with "Special Coverages & Described Causes of Loss." *See id.* § V.

38.     The "Special Coverages" include "Civil or Military Authority" coverage for losses

> resulting from the necessary **Suspension** of the Insured's business
> activities at an Insured Location if the **Suspension** is caused by
> order of civil or military authority that prohibits access to the
> **Location**. That order must result from a civil authority's response
> to direct physical loss of or damage caused by a **Covered Cause of
> Loss** to property not owned, occupied, leased or rented by the
> Insured or insured under this Policy and located within [five miles]
> of the Insured's Location . . . .

*Id.* ¶ 5.02.03.

39.     The "Special Coverages" include insurance for "Contingent Time Element" losses.  Each of the Policies:

> covers the actual Time Element loss as provided by the Policy,
> sustained by the Insured during the Period of Liability directly

> resulting from the necessary **Suspension** of the Insured's business
> activities at an Insured Location if the **Suspension** results from
> direct physical loss of or damage caused by a **Covered Cause of**
> **Loss** to Property . . . at **Direct Dependent Time Element**
> **Locations** . . . and **Attractions Properties** . . . .

*Id.* ¶ 5.02.05.

40.     "Direct Dependent Time Element Locations" are defined as "[a]ny **Location** of a direct: customer, supplier, contract manufacturer or contract service provider to the Insured" and "[a]ny **Location** of any company under a royalty, licensing fee or commission agreement with the Insured."  *Id.* ¶¶ 7.16.01, 7.16.02.  "Attraction Properties" are defined as those properties "within [one mile] of an Insured Location that attracts customers to the Insured's business."  *Id.* ¶ 7.04.

41.     The "Special Coverages" include insurance for "Protection and Preservation of Property."  The Policies state that they cover

> [t]he reasonable and necessary costs incurred for actions to
> temporarily protect or preserve Covered Property; provided such
> actions are necessary due to actual or imminent physical loss or
> damage due to a **Covered Cause of Loss** to such Covered
> Property; and [t]he Gross Earnings loss or Gross Profit loss
> sustained by the Insured for a period of time not to exceed [48
> hours] prior to and after the Insured first taking reasonable action
> for the temporary protection and preservation of Covered Property.

*Id.* ¶¶ 5.02.24.01 & 5.02.24.02.

42.     The Policies provide a range of other coverages for losses, which also may apply.

43.     The Policies also include various exclusions, including a purported "Contamination" exclusion.  This exclusion states in pertinent part:

> This Policy excludes the following unless it results from direct

physical loss or damage not excluded by this Policy.

**Contamination**, and any cost due to **Contamination** including the
inability to use or occupy property or any cost of making property
safe or suitable for use or occupancy, except as provided by the
Radioactive Contamination Coverage of this Policy.

*Id.* ¶¶ 3.03.01 & 3.03.01.01.

44.      The Policies' standard form defines **Contamination (Contaminated)** as:

Any condition of property due to the actual presence of any foreign
substance, impurity, pollutant, hazardous material, poison, toxin,
pathogen or pathogenic organism, bacteria, ***virus, disease causing
or illness causing agent***, **Fungus**, mold or mildew.

*Id.* ¶ 7.09 (emphasis added).  However, in selling the Policies, Zurich agreed to delete "virus
[and] disease causing or illness causing agent" from the definition and thus from what the
Policies excluded.

45.      Specifically, in selling the Policies, Zurich agreed to replace the standard-form
definition of excluded **Contamination (Contaminated)** by narrowing the scope of the definition
of **Contamination (Contaminated)**.  By endorsement, Zurich changed the definition of
**Contamination (Contaminated)** to:

Any condition of property due to the actual presence of any

**Contaminant(s)**.

*Id.*, Form EDGE-219-C (01/18) ¶ 11.  Zurich then defined **Contaminants** not to include "virus,
disease causing or illness causing agent."  Specifically, through its endorsement, Zurich defined
**Contaminants** as:

Any solid, liquid, gaseous, thermal or other irritant,  including but
not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals,
waste (including materials to be recycled, reconditioned or
reclaimed),  other hazardous substances, **Fungus** or **Spores**.

*Id.*, ¶ 12.  Therefore, while the **Contamination (Contaminated)** exclusion in the standard policy form included "virus, disease causing or illness causing agent," Zurich amended the Policies to remove viruses and disease-causing or illness-causing agents from the scope of the exclusion.

## ZURICH'S KNOWLEDGE OF PANDEMIC RISKS

46.     Plaintiffs are informed and believe, and on that basis allege, that by the time Zurich sold the Policies, Zurich had known for over a decade that there have been standard-form exclusions available in the insurance marketplace (such as the Virus Exclusion) that could exclude coverage for losses caused by viruses and pandemics and that other insurers had included such exclusions in policies they sold.  In fact, on information and belief, Zurich had previously sold policies to other insureds that include such exclusions.

47.     In addition, there were many publicly available reports about the risks of pandemics and what insurers should do—in the months and years before the outbreak of the COVID-19 pandemic.  For example, one article noted in March 2018:

> Even with today's technology, a modern severe pandemic would
> cause substantive direct financial losses to the insurance
> community.  In addition, indirect losses would be severe, most
> notably on the asset side of the balance sheet.[9]

48.     Other sources accessible to Zurich also demonstrate the breadth of information available to insurers.  One insurance industry repository shows the proverbial "tip of the iceberg" about how much information was available to Zurich before the Policies were issued.  The Insurance Library Association of Boston, founded in 1887, describes itself as "the leading resource for and provider of literature, information services, and quality professional education for the insurance industry and related interests."[10]  The Association states on its website:

> The past 20 years [have] seen the rise of a number of pandemics.

---

[9] "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/.

[10] http://insurancelibrary.org/about-us/.

Slate recently published an article on what has been learned about

treating them in that time. We thought it might be apt for us to take

a look back and see what the insurance industry has learned as

well.[11]

49.     The Association lists more than 20 articles, reports, and white papers available to

insurers from early 2007, long **before** Zurich sold the Policies.

50.     Thus, even though Zurich was aware of the massive losses that its insureds could

face from a virus-related pandemic, it still sold the Policies without any potentially applicable

exclusion.

51.     Zurich also has known, or should have known, for decades that its policies could

be held to cover losses from the presence of a hazardous substance, such as a virus inside

buildings or because a building could not be used for its intended purposes or function.  As

Zurich has known, or should have known, for decades many courts have held that the presence of

a hazardous substance in property, including the airspace inside buildings, constitutes property

damage and that there may be "direct physical loss" to property even if the property is not

structurally damaged.  As Zurich has known, or should have known, the many decisions include

the following:

- *AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 842 (1990):  "contamination of the

  environment satisfies" the requirement of property damage.

- *Aetna Cas. & Sur. Co. v. Pintlar Co.,* 1948 F.2d 1507, 1514 (9th Cir. 1981):  "The

  insurers further concede that contamination of the soil and water by hazardous

  substances constitutes injury to property . . . .  And an ordinary person would find

  that the environmental contamination alleged . . . falls within the plain mean of

  'property damage' as that term is used in policies."

- *Arbeiter v. Cambridge Mut. Fire Ins. Co.*, 1996 WL 1250616, at *2 (Mass. Super.

---

[11] http://insurancelibrary.org/pandemics-and-insurance/.

Ct. Mar. 15, 1996):  presence of oil fumes in building constituted "physical loss" to building.

- *Wakefern Food Corp v. Liberty Mut. Fire Ins. Co*., 968 A.2d 724, 727 (N.J. App. Div. 2009):  interruption of electrical power to the insureds' supermarkets covered because the term "physical damage" was ambiguous and the losses resulted from damage to the electrical grid, thereby rendering the store locations physically incapable of performing their intended function.

- *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.2d 399, 406 (1st Cir. 2009): odor from carpet and adhesive "can constitute physical injury to property."

- *Farmers Ins. Co. v. Trutanich,* 123 Or. App. 6, 9-11 (1993):  "[T]he odor produced by the methamphetamine lab had infiltrated the house. The cost of removing the odor is a direct physical loss."

- *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.,* 2014 WL 6675934 (D.N.J. Nov. 25, 2014):  closure of facility because of accidentally released ammonia; while "structural alteration provides the most obvious sign of physical damage, . . . property can sustain physical loss or damage without experiencing structural alteration."

- *Matzner v. Seacoast Ins. Co.*, 1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998): building with unsafe levels of carbon monoxide sustained direct physical loss.

- *Mellin v. N. Sec. Ins. Co*., 167 N.H. 544, 550-51 (2015): cat urine odor inside condominium constitutes direct physical loss; "a property policy insures 'physical loss changes to the insured property, but also changes that are perceived by a sense of smell' and 'may exist in the absence of structural damage to the insured property.'"

- *Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, 2016 WL 3267247, at *9 (D. Or. June 7, 2016):  "smoke infiltration in theatre caused direct property loss or damage by causing the property to be uninhabitable and unusable for its intended

purpose."

- *Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002): property sustained a direct physical loss because it was rendered uninhabitable by the presence of asbestos fibers.

- *Sentinel Mgt. Co. v. Aetna Cas. & Sur. Co.*, 1999 WL 540466, at *7 (Minn. Ct. App. July 27, 1999): "If rental property is contaminated by asbestos fibers and presents a health hazard to tenants, its function is seriously impaired."

- *Sentinel Mgt. Co. v. N.H. Ins. Co*., 563 N.W.2d 296, 300 (Minn. Ct. App. 1997): "Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants. . . . Under these circumstances, we must conclude that contamination by asbestos may constitute a direct, physical loss to property under an all-risk insurance policy."

- *Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 39-40 (1968): direct physical loss when gasoline contaminated church building making it dangerous to use.

- *Hughes v. Potomac Ins. Co.,* 199 Cal. App. 2d 239, 248-249 (1962), the insureds' house was left partially overhanging a cliff after landslide, but suffered no physical damage. The court rejected the insurer's argument that there was no "direct physical loss" because "[u]ntil such damage was repaired and the land beneath the building stabilized, the structure could scarcely be considered a "dwelling building"' in the sense that rational persons would be content to reside there.

52.     Thus, Zurich has known, or should have known, for decades that its policies would be called upon to pay perhaps hundreds of millions of dollars or more to their insureds,

and specifically knows that it could be obligated under its policies to pay tens of millions of dollars to Plaintiffs for losses associated with viruses and pandemics.

53.     Given the potential liability that insurers, including Zurich, faced under their policies for losses from pandemics, shortly after the outbreak of SARS in 2003, the insurance industry undertook to draft exclusions applicable to losses from viruses and bacteria.  In 2006, the Insurance Services Office, the insurance industry's drafting organization, considered the need to draft an exclusion that would bar coverage for losses caused by a virus.[12]

54.     On July 6, 2006, ISO prepared a circular that included a standard exclusion of loss due to viruses and bacteria as part of its filing with state insurance regulators.[13]  In that circular, it noted that examples of "viral and bacterial contaminants are rotavirus, SARS, [and] influenza," observing, "[t]he universe of disease-causing organisms is always in evolution."[14] ISO recognized that viruses could cause property damage, stating:

> Disease-causing agents may render a product impure (change its
> quality or substance), or enable the spread of disease by their
> presence on interior building surfaces or the surfaces of personal
> property.  When disease-causing viral or bacterial contamination
> occurs, potential claims involve the cost of replacement of property
> (for example, the milk), cost of decontamination (for example,
> interior building surfaces), and business interruption (time
> element) losses.[15]

---

[12] "ISO is a non-profit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for their general liability policies."  *Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 Cal. 4th 645,671 n.13 (1995).

[13] *See ISO* Circular, "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

[14] *Id.*

[15] *Id.*

55.     Thus, Zurich and the rest of the insurance industry have long recognized that the presence of a virus on or around property can constitute direct physical loss of or damage to property, and many insurers throughout the country employ exclusions purportedly designed to limit or bar coverage for certain losses and expenses caused by the presence of a virus.  Zurich made the deliberate decision not to include any such exclusions in the Policies.

### THE COVID-19 PANDEMIC AND ENSUING CIVIL AUTHORITY ORDERS

56.     COVID-19 is a disease caused by a virus known as SARS-CoV-2.  As the World Health Organization has stated:

> Official names have been announced for the virus responsible for COVID-19 (previously known as "2019 novel coronavirus") and the disease it causes.  The official names are:
>
> **Disease**
>
> coronavirus disease
>
> (COVID-19)
>
> **Virus**
>
> severe acute respiratory syndrome coronavirus 2
>
> (SARS-CoV-2).[16]

57.     The World Health Organization also provided a straight-forward example of the distinction between a virus and a disease:

> Viruses, and the diseases they cause, often have different names. For example, HIV is the virus that causes AIDS.  People often know the name of a disease, such as measles, but not the name of the virus that causes it (rubeola).
>
> There are different processes, and purposes, for naming viruses

---

[16] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it.

and diseases.[17]

58.    The first reported cases of COVID-19 in humans were diagnosed in December 2019 in Wuhan, China.  Since then, SARS-CoV-2 and COVID-19 have spread throughout the world, prompting the World Health Organization to declare a global pandemic.

59.    As explained by the World Health Organization,

People can catch COVID-19 from others who have the [SARS-CoV-2] virus. The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales. These droplets land on objects and surfaces around the person. Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth. People can also catch COVID-19 if they breathe in droplets from a person with COVID-19 who coughs out or exhales droplets.[18]

60.    Aerosolized droplets exhaled by normal breathing can travel significant distances and stay suspended in air and infective for 16 hours, until gravity ultimately forces them to the nearest surface.[19]  Studies have reported that SARS-CoV-2 can remain on surfaces for at least 28 days.[20]  These droplets thus physically alter the air and airspace in which they are present and the surfaces to which they attach.  By doing so, they also render property unusable for its intended purpose and function and require further physical alterations, such as installation of physical barriers restricting the movement of the aerosolized droplets.

[17] *Id.*
[18] *See* https://www.who.int/news-room/q-a-detail/q-acoronaviruses.
[19] *See* Leslie Tate, *Virus Survives In Air For Hours,* TULANIAN (Fall 2020), https://tulanian.tulane.edu/fall-2020/virus-survives-in-air-for-hours.
[20] *See, e.g.,* CNBC, *Virus that causes Covid-19 can survive for 28 days on common surfaces, research says* (Oct. 12, 2020), https://www.cnbc.com/2020/10/12/virus-that-causes-covid-19-can-survive-for-28-days-on-surfaces-research-says.html; Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles, & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J., ART. No. 145 (2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7.

61.     As of the date of the filing of this Complaint, there have been more than 112,000,000 confirmed cases of COVID-19 throughout the world, more than 2,490,000 of which have resulted in deaths.[21]  There have been more than 28,400,000 confirmed cases of COVID-19 in the United States, more than 508,000 of which have resulted in deaths.[22]  Moreover, due in part to the initial absence of available tests, it is believed that the true number of coronavirus cases is significantly higher than the reported numbers might suggest.[23]

62.     In March 2020, in response to the pandemic and the worldwide spread of SARS-CoV-2 and COVID-19, civil authorities throughout the United States began issuing "stay home" and "shelter in place" quarantine orders and requiring the suspension of non-essential business operations and activities.

63.     Also starting in March 2020, state and local health departments and other civil authorities throughout the United States began issuing orders and directives designed to avoid the spread of SARS-CoV-2 and COVID-19 and compel compliance with guidance issued by the Centers for Disease Control and Prevention ("CDC"), the Centers for Medicare & Medicaid Services ("CMS"), and other federal and state civil authorities.  Many of these orders and directives imposed temporary prohibitions on non-emergency medical services and procedures, including elective procedures and non-urgent admissions.  As a result of these orders, at various points from March 2020 through late 2020, hospitals and medical providers throughout the country were forced to delay elective surgeries and procedures and cease non-urgent hospital admissions and appointments.

64.     Moreover, starting in March 2020, state and local health departments and other civil authorities throughout the United States began issuing orders and guidelines aimed at slowing the spread of SARS-CoV-2 and COVID-19 in skilled nursing, rehabilitative, and post acute care facilities.  Among other things, these orders and guidelines imposed restrictions on

---

[21] *See* https://covid19.who.int/.
[22] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[23] *See* https://www.nbcnews.com/health/_health-news/how-many-people-have-had-coronavirus-no-symptoms-n1187681.

who was permitted to enter skilled nursing, rehabilitative, and post acute care facilities. At various points, access to skilled nursing, rehabilitative, and post acute care facilities was limited to employees, medical personnel providing emergency, other essential medical services, and end-of-life visitors in some instances.

65. In addition, beginning in or around March 2020, federal, state, and local health departments and other civil authorities throughout the United States began imposing restrictions on skilled nursing, rehabilitative, and post acute care facilities in which residents or patients had confirmed or suspected cases of COVID-19. In many cases, such facilities were required to implement immediate quarantine, testing, and cleaning protocols pursuant to the requirements imposed by federal, state, and local civil authorities—and the facilities typically were prohibited from admitting new residents or patients until they had gone several days or weeks without any additional positive cases of COVID-19.

66. The above-referenced orders were issued because of the physical presence of SARS-CoV-2 throughout the country—and, specifically, in hospitals and skilled nursing, rehabilitative, and post acute care facilities throughout the communities immediately surrounding Plaintiffs' insured locations and property—and the desire to avoid the spread of the virus and the disease that it causes, COVID-19. These civil authority actions were taken because of the highly-contagious nature of SARS-CoV-2 and the ways in which it physically alters tangible property—including airspace, furniture, surfaces, and other personal property in and around buildings.

67. Though microscopic, SARS-CoV-2—like all viruses—is a physical substance. The virus is highly contagious and mobile. The SARS-CoV-2 virus spreads from person to person primarily through fine aerosolized droplets containing the virus. These aerosolized droplets are expelled into the air when infected individuals breathe, talk, sing, cough, or sneeze. Their presence in the air and airspace constitutes a physical alteration to the air and airspace, constituting physical damage. Once released, these droplets can physically rest and remain on surfaces of objects or materials for up to 28 days. Human contact with the air, airspace, and

surfaces can lead to transmission of the virus, making it very dangerous for individuals to come in contact with property contaminated by the SARS-CoV-2 virus. This is a particular concern for places open to the public or that contain numerous common touchpoints and areas, such as door handles and bathrooms, with surfaces that are used by multiple people every day.

68.     Aerosolized droplets expelled by individuals with COVID-19 also can linger suspended in the airspace of buildings for up to 16 hours. Scientists have likened the ubiquitous aerosolized droplets of the virus to smoke, present in the air long after the source of its dissemination has gone.[24] Thus, entering a building or other location where the SARS-CoV-2 virus is physically present in the air poses an imminent and severe risk to human health.

69.     Because SARS-CoV-2 attaches to surfaces, lingers in the air and airspace of buildings, and can move through HVAC systems to spread throughout buildings, the presence of SARS-CoV-2 causes a distinct, demonstrable, physical alteration to property, thus causing "direct physical loss of or damage to property" as that phrase is used in the Policies.[25] Just like invisible pollution in water *alters* the water, the presence of the SARS-CoV-2 virus *alters* the air and airspace in which it is found and the property on which it lands. In fact, the presence of SARS-CoV-2-causes a physical transformation of the air and surfaces. It changes the air and the surfaces into dangerous transmission mechanisms for SARS-CoV-2, rendering the affected property unsafe and unfit for its ordinary functional use.

70.     Thus, since March 2020, the SARS-CoV-2 virus has been widespread throughout the United States, causing physical loss of and damage to airspace and other property.

---

[24] *See* "Airborne Transmission of SARS-CoV-2," *Science* (Oct. 16, 2020), available at https://science.sciencemag.org/content/370/6514/303.2.
[25] *See* Jianyun Lu & Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 Emerging Infectious Diseases 11 (Sep. 11, 2020), https://wwwnc.cdc.gov/eid/article/26/11/20-3774_article#suggestedcitation ("We conclude that the air conditioner prompted transmission of SARS-CoV-2; the customers in the airflow were at high risk for infection with SARS-CoV-2 in the poorly ventilated environment.

## THE PLAINTIFFS' LOSSES

71.     As a result of SARS-CoV-2, COVID-19, and the aforementioned civil authority orders, each of the Plaintiffs have suffered loss and damage covered under the Policies issued by Zurich.

72.     Indeed, SARS-CoV-2 has been present at each of the Facilities' insured locations, causing direct physical loss of or damage to property.  Since late March 2020, the Facilities have had hundreds of confirmed cases of COVID-19 between their respective residents and employees.

73.     Thus, since March 2020, SARS-CoV-2 has inevitably been present at various times at each of the Facilities' insured locations.  Because SARS-CoV-2 can physically adhere to surfaces of property for several days and physically linger in the air in buildings for several hours, the presence of SARS-CoV-2 on or around property causes "direct physical loss of or damage to property" as that phrase is used in the Policies.  In fact, given the manner in which SARS-CoV-2 lingers in the air and on surfaces and its manner of transmission, the presence of the virus at the Facilities' insured locations necessitated substantial physical transformations to property—including, but not limited to, physically rearranging the Facilities' insured locations (and the personal property within those locations) to make room for quarantine areas.  These physical transformations impaired the Facilities' business operations, resulting in the necessary "Suspension" of the Facilities' business activities as that term is used in the Policies.

74.     Furthermore, as a result of the confirmed presence of SARS-CoV-2 at the Facilities' insured premises and the imminent threat posed by the virus, each of the Facilities was prohibited by federal, state, and local health officials from admitting new residents and patients at various points in time.  These orders of state and local health officials, who qualify as "civil authorities" as that phrase is used in the Policies, resulted in the necessary slowdown or "Suspension" of the Facilities' business activities.  These civil authority orders also substantially impaired the essential functionality of the Facilities' premises by rendering the property unable

to be used for its intended and normal purpose and, consequently, causing "direct physical loss of or damage to property" as that phrase is used in the Policies.

75.     In addition, each of the Facilities also suffered losses attributable to the inability of local hospitals and other medical providers to perform non-emergency, elective medical procedures.  These local hospitals and medical providers qualify as the Facilities' "Direct Dependent Time Element Locations" and/or "Attraction Properties" as defined in the Policies. Indeed, the Facilities derive substantial revenue from patients admitted for rehabilitative care and other services following non-emergency, elective medical procedures and surgeries. Accordingly, when local hospitals and medical offices were prohibited by order of civil authority from performing non-emergency, elective medical procedures and surgeries, the Facilities suffered losses resulting from the necessary slowdown or "Suspension" of their business activities.  This slowdown or "Suspension" of business activities was necessitated and caused by the presence of SARS-CoV-2 at local hospitals and medical offices, as well as the inability of local hospitals and medical offices to use their premises and property for their intended purposes—all of which constitutes "direct physical loss of or damage to property" as that phrase is used in the Policies.

76.     Similarly, the Capstone Entities likewise suffered losses as a result of the inability of local hospitals and other medical providers to perform non-emergency, elective medical procedures.  These local hospitals and medical providers qualify as the Capstone Entities' "Direct Dependent Time Element Locations" and/or "Attraction Properties" as defined in the Policies.  Indeed, the Capstone Entities derive the vast majority of their revenue from providing non-emergency transportation services to and from nearby hospitals and medical offices. Accordingly, when local hospitals and medical offices were prohibited by order of civil authority from performing non-emergency, elective medical procedures and surgeries, and when providers were prohibited from seeing patients in their offices, the Capstone Entities suffered losses resulting from the necessary slowdown or "Suspension" of their business activities.  This slowdown or "Suspension" of business activities was necessitated and caused by the presence of

SARS-CoV-2 at local hospitals and medical offices, as well as the inability of local hospitals and medical offices to use their premises and property for their intended purposes—all of which constitutes "direct physical loss of or damage to property" as that phrase is used in the Policies.

77. Relatedly, the Capstone Entities suffered losses attributable to their inability to access local skilled nursing, rehabilitative, and post acute care facilities—which likewise qualify as the Capstone Entities' "Direct Dependent Time Element Locations" as defined in the Policies. Again, the Capstone Entities derive most of their revenue from transporting patients to and from hospitals and medical offices, and many of those patients are residents of local skilled nursing, rehabilitative, and post acute care facilities. Accordingly, during the periods when such individuals were unable to schedule non-emergency, elective medical procedures and surgeries, the Capstone Entities suffered losses resulting from the necessary slowdown or "Suspension" of their business activities. This slowdown or "Suspension of business activities was caused by the presence of SARS-CoV-2 at local skilled nursing, rehabilitative, and post acute care facilities, as well as the inability of these facilities to use their premises and property for their intended purposes—all of which constitutes "direct physical loss of or damage to property" as that phrase is used in the Policies.

78. Finally, the PMD Entities suffered losses attributable to their inability to access local skilled nursing and post acute care facilities—which qualify as the PMD Entities' "Direct Dependent Time Element Locations" as defined in the Policies. The PMD Entities derive most of their revenue by providing x-ray and mobile laboratory services to residents of nearby skilled nursing and post acute care facilities. Accordingly, during the periods when such individuals were unable to schedule non-emergency medical procedures, and when entry into such facilities was prohibited or severely restricted, there was reduced demand for the x-ray and mobile laboratory services that the PMD Entities provide, thereby causing the PMD Entities to suffer losses resulting from the necessary slowdown or "Suspension" of their business activities. This slowdown or "Suspension of business activities was caused by the presence of SARS-CoV-2 at local skilled nursing, rehabilitative, and post acute care facilities, as well as the inability of these

facilities to use their premises and property for their intended purposes—all of which constitutes "direct physical loss of or damage to property" as that phrase is used in the Policies.

79.     Thus, Plaintiffs have suffered losses falling squarely within the coverage afforded under the Policies.

80.     To the extent not waived or otherwise excused, Plaintiffs have complied with all terms and conditions precedent contained in the Policies.  Therefore, Plaintiffs are entitled to all benefits of insurance provided by the Policies.

## ZURICH'S BREACHES AND BAD FAITH CONDUCT

81.     Plaintiffs have sustained covered Time Element and Extra Expense losses as defined in the Policies.  These Time Element and Extra Expense losses were sustained because of the "necessary **Suspension**" of Plaintiffs' business operations as a result of "direct physical loss of or damage to" insured premises, "Attraction Properties," and "Direct Dependent Time Element Locations."  Plaintiffs' Time Element losses also were caused by various orders and actions of state and local health departments and other civil authorities throughout the United States, which constitute "order(s) of civil or military authority that prohibit[] access," as that phrase is used in the Policies.

82.     Many of Plaintiffs' financial losses are insured under one or more "Special Coverages" in the Policies.  These losses were caused by the presence of SARS-CoV-2 on, in, or around property, the various orders and actions of state and local health departments and other civil authorities throughout the United States, or both.

83.     The various orders of state and local health departments and other civil authorities throughout the United States were issued in response to the presence of SARS-CoV-2 throughout the country, and specifically throughout the communities immediately surrounding Plaintiffs' insured premises and property, and to curb the spread of the virus and the disease that it causes, COVID-19.

84.     Similarly, many Direct Dependent Time Element Locations and Attraction Properties located near Plaintiffs' premises or property suffered "direct physical loss of or

damage" to property as a result of the presence of SARS-CoV-2 at their properties, the various orders and actions of state and local health departments and other civil authorities throughout the United States, or both. Again, on information and belief, SARS-CoV-2 was present on, in, and around property at various local Direct Dependent Time Element Locations and Attraction Properties near Plaintiffs' insured premises and property, rendering the Direct Dependent Time Element Locations and Attraction Properties unsafe and unusable, and causing direct physical loss or damage to property. Furthermore, given the nature of SARS-CoV-2 and how it causes loss and damage to property, the functionality of these Direct Dependent Time Element Locations and Attraction Properties was impaired and they were unable to be used for their normal and intended purposes. As a result of the "direct physical loss of or damage" to Direct Dependent Time Element Locations and Attraction Properties near Plaintiffs' insured premises and property, Plaintiffs sustained substantial financial losses covered under the Policies.

85. Although Plaintiffs sustained substantial losses falling squarely within the coverage afforded under the Policies, Zurich has failed and refused to acknowledge coverage for Plaintiffs' losses. Zurich also has refused to acknowledge coverage for Extra Expenses and other costs covered under the Policies, including costs reasonably and necessarily incurred by Plaintiffs to mitigate and prevent their losses.

86. In denying coverage for Plaintiffs' claims, and continuing to deny coverage, Zurich asserted that Plaintiffs' losses were not caused by "direct physical loss of or damage to property" and, in any event, would be excluded by the Contamination exclusion discussed above.

87. As discussed above, Plaintiffs are informed and believe, and on that basis allege, that contrary to its denial of coverage for Plaintiffs' claims, Zurich has known for decades that the presence of hazardous substances constitutes property damage. Zurich has also known for decades that its policies could be held to cover losses from the presence of a hazardous substance, such as a virus inside buildings, or because a building could not be used for its intended purpose or function. As Zurich is no doubt aware, many courts have held that the

presence of a hazardous substance in property, including the airspace inside buildings, constitutes "direct physical loss of or damage" to property.

88.     Before denying coverage, Zurich was required under the governing legal principles and insurance industry custom and practice to conduct a thorough investigation of facts that might support Plaintiffs' claims.  Plaintiffs are informed and believe, and on that basis allege, that Zurich did not conduct the required investigation before denying Plaintiffs' claims. After a slanted and superficial investigation into Plaintiffs' losses, Zurich denied Plaintiffs' claims, incorrectly asserting that Plaintiffs' losses did not fall within the Policies' coverage. Zurich took this position even though Plaintiffs had established losses falling squarely within the Policies, and even though the Policies do not have any exclusions that apply as a bar to coverage.

89.     Zurich denied coverage even though it knew, or should have known, that by selling the Policies without a virus exclusion or pandemic exclusion, Plaintiffs reasonably would understand and expect that the Policies covered losses associated with viruses.  Zurich knew that it should not deny coverage when the Policies had no such exclusion, when its insureds reasonably would (and did) expect coverage for losses associated with viruses and pandemics, and when any ambiguity in the Policies would be resolved in favor of any reasonable interpretation held by Plaintiffs.  And, perhaps most importantly, Zurich knew it should not and could not rely on an exclusion that was deleted from the Policies and narrowed substantially by endorsement.

90.     Indeed, in recognition that it knew the Contamination exclusion in the Policies did not apply as framed, Zurich purported to modify the Contamination exclusion in the renewal policies it sold to Cornet Limited, Ltd. and Ensign Services, Inc. for the December 1, 2020, to December 1, 2021, policy period.  In these renewal policies, Zurich replaced Endorsement EDGE-219-C (01/18) with Endorsement EDGE-219-D (10/20).  In the revised iteration of the endorsement, Zurich included new language asserting that the "endorsement only applies to locations in Louisiana," a state in which no insured entities are even based.  Zurich's gambit is a transparent and improper attempt to re-introduce the deleted Contamination exclusion and, going

forward, make it applicable in all states other than Louisiana. It is clear that Zurich drafted and surreptitiously included this new endorsement with full knowledge that its prior endorsement— i.e., the one that Zurich included in the Policies—was very different and was not limited in application to Louisiana. A true and correct copy of Endorsement EDGE-219-D (10/20) is attached hereto as **Exhibit C** and incorporated herein by reference.

91.     Thus, Zurich knows that its reliance on the Contamination exclusion in the Policies is misplaced—just as it knows that, contrary to its denial of coverage, Plaintiffs' losses were caused by "direct physical loss of or damage to property."

92.     By taking the positions and acting as alleged above, Zurich has breached its contractual obligations and acted in bad faith. Its wrongful conduct as alleged herein has caused, and will continue to cause, significant damage to Plaintiffs.

## COUNT I: BREACH OF CONTRACT

**(Plaintiffs Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar Against Zurich)**

93.     Plaintiffs Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar reallege and incorporate by reference paragraphs 1 through 92 above, as though fully set forth herein.

94.     By acting as alleged above, Zurich breached its duties under the Cornet Policy.

95.     Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar have performed all obligations required of them under the Cornet Policy, except those otherwise excused.

96.     Zurich breached its duties under the Cornet Policy by, among other things:

        a.      Failing and refusing to pay for Time Element and Special Coverage losses sustained as a result of SARS-CoV-2, COVID-19, and/or the Civil Authority Orders;

b.     Failing and refusing to pay for Contingent Time Element losses, such as Attraction Property losses, sustained as a result of SARS-CoV-2, COVID-19, and/or the Civil Authority Orders;

c.     Failing and refusing to pay for Extra Expense incurred in response to SARS-CoV-2, COVID-19, and/or the Civil Authority Orders;

d.     Refusing to pay for the amounts that Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar reasonably spent to reduce their losses, even though the Cornet Policy requires them to "mitigate" their losses and both the Cornet Policy and common law obligate Zurich to pay for amounts reasonably incurred in an effort to mitigate loss; and

e.     Otherwise acting as alleged above.

97.     As a direct and proximate result of Zurich's breaches, Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar have sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limits. Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar will seek leave to amend this Complaint once they ascertain the full extent of their damages. Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar are also entitled to interest on their damages at the legal rate. Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar continue to suffer damages because of Zurich's contractual breaches in amounts to be established at trial.

## COUNT II: BREACH OF CONTRACT

**(Plaintiffs The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA Against Zurich)**

98.     Plaintiffs The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA reallege and incorporate by reference paragraphs 1 through 92 above, as though fully set forth herein.

99.     By acting as alleged above, Zurich breached its duties under the Policy.

100.   The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA have performed all obligations required of them under the Ensign Policy, except those otherwise excused.

101.   Zurich breached its duties under the Ensign Policy that it issued to The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA by, among other things:

        a.   Failing and refusing to pay for Time Element and Special Coverage losses sustained as a result of SARS-CoV-2, COVID-19, and/or the Civil Authority Orders;

        b.   Failing and refusing to pay for Contingent Time Element losses, such as Attraction Property losses, sustained as a result of SARS-CoV-2, COVID-19, and/or the Civil Authority Orders;

        c.   Failing and refusing to pay for Extra Expense incurred in response to SARS-CoV-2, COVID-19, and/or the Civil Authority Orders;

        d.   Refusing to pay for the amounts that The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA reasonably spent to reduce their losses, even though the Ensign Policy requires them to "mitigate" their losses and both Ensign Policy and common law obligate Zurich to pay for amounts reasonably incurred in an effort to mitigate loss; and

        e.   Otherwise acting as alleged above.

102.   As a direct and proximate result of Zurich's breaches, The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA have sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limits.  The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA will seek leave to amend this Complaint once they ascertain the full extent of their damages.  The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA are also entitled to interest on their damages at the legal rate.  The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA continue to suffer damages because of Zurich's contractual breaches in amounts to be established at trial.

## COUNT III: BAD FAITH DENIAL OF INSURANCE

### (Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar Against Zurich)

103.    Plaintiffs Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 92, and 94 through 96 above, as though fully alleged herein.

104.    At all pertinent times, Zurich had a duty to act in good faith and deal fairly with Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar as its insureds, and Zurich was and is forbidden from doing anything which will have the effect of destroying or injuring their rights to receive the full benefits of the contract. This is a duty that extends to and informs all of Zurich's obligations under the Cornet Policy.

105.    This duty of good faith and fair dealing includes affirmative duties to promptly, fairly and honestly investigate and evaluate each claim, to reach valid coverage positions, and to articulate the reasons for such positions.

106.    Instead of complying with these duties, Zurich breached its duty of good faith and fair dealing by, among other things:

      a.    failing to conduct a full and thorough investigation of claims for insurance coverage under the Cornet Policy and asserting grounds for denying coverage without conducting such investigation;

      b.    wrongfully and unreasonably asserting grounds for denying coverage that it knew, or should have known, are not supported by, and in fact are contrary to, the terms of the Cornet Policy, the law, and the facts;

      c.    failing to fully inquire into the bases that might support coverage for Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar, claims;

      d.    failing to conduct an adequate investigation of the losses suffered by Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift,

New England Medical, and Medstar, and asserting grounds for disputing coverage based on its inadequate investigation;

e.    unreasonably failing and refusing to honor its promises and representations in the Cornet Policy it issued to Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar;

f.    giving greater consideration to its own interests than it gave to Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar's interests; and

g.    otherwise acting as alleged above.

107.    Zurich knew there was no reasonable basis, or recklessly disregarded the lack of reasonable basis, for the foregoing acts and/or omissions.

108.    In breach of the implied covenant of good faith and fair dealing, Zurich did the things and committed the acts alleged above for the purpose of consciously withholding from Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar the rights and benefits to which there are and were entitled under the Cornet Policy.

109.    Such actions are inconsistent with the reasonable expectations of Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar are contrary to established industry custom and practice, are contrary to legal requirements, are contrary to the express terms of the Cornet Policy, and constitute bad faith.

110.    As a direct and proximate result of these bad faith breaches, which are continuing as of the date of the filing of this Complaint, Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar have sustained, and will continue to sustain, significant compensatory and monetary damages, as well as punitive damages, for which the Insurers are liable. Furthermore, Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar are entitled to an award of attorneys' fees and costs.

## COUNT IV: BAD FAITH DENIAL OF INSURANCE

**(Plaintiffs The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA Against Zurich)**

111.    Plaintiffs The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 92, and 99 through 101 above, as though fully alleged herein.

112.    At all pertinent times, Zurich had a duty to act in good faith and deal fairly with The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA as its insureds, and Zurich was and is forbidden from doing anything which will have the effect of destroying or injuring their rights to receive the full benefits of the contract.  This is a duty that extends to and informs all of the Zurich's obligations under the Ensign Policy.

113.    This duty of good faith and fair dealing includes affirmative duties to promptly, fairly and honestly investigate and evaluate each claim, to reach valid coverage positions, and to articulate the reasons for such positions.

114.    Instead of complying with these duties, Zurich breached its duty of good faith and fair dealing by, among other things:

      a.    failing to conduct a full and thorough investigation of claims for insurance coverage under the Ensign Policy and asserting grounds for denying coverage without conducting such investigation;

      b.    wrongfully and unreasonably asserting grounds for denying coverage that they knew, or should have known, are not supported by, and in fact are contrary to, the terms of the Ensign Policy, the law, and the facts;

      c.    failing to fully inquire into the bases that might support coverage for The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA's claims;

      d.    failing to conduct an adequate investigation of the losses suffered by The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA, and asserting grounds for disputing coverage based on its inadequate investigation;

e.   unreasonably failing and refusing to honor its promises and representations in the Ensign Policy it issued to The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA;

f.   giving greater consideration to its own interests than it gave to The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA's interests; and

g.   otherwise acting as alleged above.

115.   Zurich knew there was no reasonable basis, or recklessly disregarded the lack of reasonable basis, for the foregoing acts and/or omissions.

116.   In breach of the implied covenant of good faith and fair dealing, Zurich did the things and committed the acts alleged above for the purpose of consciously withholding from The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA the rights and benefits to which they are and were entitled under the Ensign Policy.

117.   Such actions are inconsistent with the reasonable expectations of The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA, are contrary to established industry custom and practice, are contrary to legal requirements, are contrary to the express terms of the Ensign Policy, and constitute bad faith.

118.   As a direct and proximate result of these bad faith breaches, which are continuing as of the date of the filing of this Complaint, The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA has sustained, and will continue to sustain, significant compensatory and monetary damages, as well as punitive damages, for which the Insurers are liable. Furthermore, The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA are entitled to an award of attorneys' fees and costs.

## COUNT V: DECLARATORY JUDGMENT

**(Plaintiffs Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar Against Zurich)**

119.    Plaintiffs Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 92 above, as though fully alleged herein.

120.    Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar contend that they are entitled to coverage for their losses under the Cornet Policy and that their contentions stated above are correct.

121.    Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar are informed and believe, and on that basis allege, that Zurich disputes their contentions and contends that they are not entitled to coverage under the Cornet Policy for any of their losses.

122.    Therefore, an actual and justiciable controversy exists between Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar and Zurich concerning the matters alleged herein.

123.    Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar seek a judicial declaration by this Court in accord with its contentions and rejecting Zurich's contentions and stating that their losses are insured under the Cornet Policy.

124.    A declaration is necessary at this time in order that the parties' dispute may be resolved and that they may be aware of their prospective rights and duties.

## COUNT VI: DECLARATORY JUDGMENT

**(Plaintiffs The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA Against Zurich)**

125.    Plaintiffs The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 92 above, as though fully alleged herein.

126.    The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA contend that they are entitled to coverage for their losses under the Ensign Policy and that their contentions stated above are correct.

127.    The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA are informed and believe, and on that basis allege, that Zurich disputes their contentions and contends that they are not entitled to coverage under the Ensign Policy for any of their losses.

128.    Therefore, an actual and justiciable controversy exists between The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA and Zurich concerning the matters alleged herein.

129.    The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA seek a judicial declaration by this Court in accord with their contentions and rejecting Zurich's contentions and stating that their losses are insured under the Ensign Policy.

130.    A declaration is necessary at this time in order that the parties' dispute may be resolved and that they may be aware of their prospective rights and duties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

### **ON COUNT I**

1.    Enter a judgment on Count I of the Complaint in favor of Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar against Zurich and award damages for breach of contract in an amount to be proven at trial, plus the legal interest;

### **ON COUNT II**

2.    Enter a judgment on Count II of the Complaint in favor of The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA against Zurich and award damages for breach of contract in an amount to be proven at trial, plus the legal interest;

**ON COUNT III**

3.      Enter a judgment  on County III of the Complaint in favor of Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar against Zurich for damages, including reasonable attorneys' fees plus interest, according to proof at the time of trial;

4.      Enter a judgment in favor of Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar against Zurich for punitive damages in an amount to be determined at the time of trial;

**ON COUNT IV**

5.      Enter a judgment on Count IV of the Complaint in favor of The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA against Zurich for damages, including reasonable attorneys' fees plus interest, according to proof at the time of trial;

6.      Enter a judgment on Count IV of the Complaint in favor of The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA against Zurich for punitive damages in an amount to be determined at the time of trial;

**ON COUNT V**

7.      Enter a judgment on Count V of the Complaint in favor of Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar against Zurich and a declaration in accord with Plaintiffs' contentions, as follows;

       i.      Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar are entitled to coverage for their losses under the Cornet Policy and that their contentions stated above are correct;

      ii.      Zurich is obligated to pay Granite Creek, Riverbend, Lynnwood, Lone Star, MavStar, Healthlift, New England Medical, and Medstar for the full amount of the losses incurred as alleged herein.

**ON COUNT VI**

8.　　Enter a judgment on Count VI of the Complaint in favor of The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA against Zurich and a declaration in accord with Plaintiffs' contentions, as follows;

     i.　　The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA are entitled to coverage for their losses under the Ensign Policy and that their contentions stated above are correct;

    ii.　　Zurich is obligated to pay The Springs, Pacific Mobile, PMDTC, PMDLAB, and PMDCA for the full amount of losses, as alleged herein.

**ON ALL COUNTS**

9.　　Award Plaintiffs costs of suit incurred herein; and

10.　　Award Plaintiffs such other, further, and/or different relief as may be just and proper.

**<u>JURY DEMAND</u>**

Plaintiffs hereby demand trial by jury on all issues so triable.


Respectfully submitted this 26th day of February 2021.


       /s/ *Katherine M. O'Brien*
     Katherine M. O'Brien, Partner
     kobrien@tdrlawfirm.com
     Amie M. Bauer
     abauer@tdrlawfirm
     Tabet DiVito & Rothstein LLC
     209 S. LaSalle Street, 7th Fl.
     Chicago, IL 60604
     Office: (312) 762-9487

Shaun H. Crosner (*Pro Hac Vice* to be filed)
scrosner@pasichllp.com
Nicolas A. Pappas (*Pro Hac Vice* to be filed)
npappas@pasichllp.com
PASICH LLP
1230 Rosecrans Avenue, Suite 690
Manhattan Beach, CA 90266
Telephone:  (424) 313-7860
Facsimile:   (424) 313-7890


*Attorneys for Plaintiff*